# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GERALD BULLOCKS,

        Plaintiff,

    v.

C/O HALE, et al.,

        Defendants.

Case No. 1:18-cv-288

Barrett, J.
Bowman, M.J.

## REPORT AND RECOMMENDATION

Plaintiff, an incarcerated individual who proceeds *pro se*, has filed six cases in this Court, two of which were dismissed as frivolous on initial screening under 28 U.S.C. §§1915(e)(2)(B) and 1915A(B)(1).[1] Upon initial screening, the instant complaint was construed as alleging that two Correctional Officers at the Southern Ohio Correctional Facility ("SOCF") violated Plaintiff's Eighth Amendment rights, which was deemed to be a non-frivolous claim that should be permitted to proceed to discovery. (Docs. 3, 4). Plaintiff filed an amended complaint on May 24, 2018, more specifically identifying the two Defendants as C/O Stephen Hale and C/O Gary Hunley. (Doc. 8). Plaintiff seeks "punitive damages, nominal damages and compensatory damages" in the amount of $200,000.00 from each of the Defendants, a transfer to an "out of state" facility, and recovery of his court costs. (Doc. 8 at 7).

---

[1]The two civil rights cases dismissed with prejudice on initial screening were Case Nos. 1:18-cv-434 and 1:18-cv-565. The Court granted summary judgment to the Defendants in a third civil rights case, Case No. 1:17-cv-440. This Court also dismissed Bullock's habeas corpus petition with prejudice on February 22, 2019. *See* Case No. 1:18-cv-313. Plaintiff's still-pending cases include the above-captioned case and a fifth civil rights case filed as Case No. 1:18-cv-23.

Pursuant to local practice, this case has been referred to the undersigned magistrate judge. Discovery has now closed, and the parties have filed cross-motions for summary judgment. The undersigned now recommends that Defendants' motion for summary judgment be granted, and that Plaintiff's motion be denied.

## I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252. As Plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). However, his

2

status as a pro se litigant does not alter his burden of supporting his factual assertions with admissible evidence when faced with a summary judgment motion. *Maston v. Montgomery Cnty. Jail Med. Staff Personnel*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010)).

In this case, both Plaintiff and Defendants are moving parties. The undersigned has evaluated each of the respective motions for summary judgment according to the above standards of review. Because the undersigned has concluded that Defendants' motion should be granted, the undersigned has construed all reasonable factual inferences in Plaintiff's favor.

## II.    Findings of Fact

On August 28, 2016, shortly before the incident that forms the basis for his complaint, Plaintiff flooded his cell, threatened correctional officers, and refused to comply with orders to cuff up in order to be removed from his cell and transported to a segregation unit. (Video Recording 20, Doc. 29-1). Plaintiff pleaded guilty to two disciplinary offenses, including violations of Rules 21 and 61, but pleaded not guilty to two other charges before the Rules Infraction Board ("RIB"). (Doc. 28-6 at 4). After a hearing, the RIB found him guilty of three rule violations and sentenced him to 15 days in disciplinary segregation. (*Id.*)

Based upon Plaintiff's admitted refusal to comply with a direct order to cuff up and pursuant to institutional policies, a 5-member use-of-force team was organized, along with a videographer, in order to extract and transport Plaintiff to a holding cell by force. (Video Recording 21, 00:30-1:05). The named Defendants are two of the officers who

participated on that team; others included Lt. Broughton (leader), C/O Spradlin, and C/O Rigdon. (*Id.*, *see also* Doc. 29-2 at 3, 5).

In addition to the extraction team, C/O Kimberly Hunley operated the video camera, and C/O Rayburn participated as a "shield man" due to Plaintiff having thrown water on the range earlier. (Doc. 29-2 at 3). Nurse Mault from Medical and Nurse Jenkins from Mental Health also were present. (Doc. 29-2 at 4). In addition, Officers Hawk and Irvin were witnesses. (Doc. 29-2 at 3; Doc. 29-2 at 6-7, 27-28 (statements by C/O Hawk and C/O Irvin). Lt. Eshem participated as a crisis negotiator, attempting to persuade Plaintiff to comply with orders to cuff up and warning him that force would be employed if he did not comply. (Video Recording 20, 1:30-1:51). However, Plaintiff declined to obey, stating "get the team, I'm not coming out." (*Id.*) The video record includes a verbal explanation of the planned force by Lt. Broughton just before its execution, as well as video of subsequent events. (Video Recording 21).

The primary tool employed to extract Plaintiff from his cell was the deployment of OC pepper spray, which Plaintiff does not contest in this case.[2] Lt. Broughton deployed OC spray and waited approximately 15 minutes for the spray to take effect prior to re-entering the cell block. (Video Recording 20, 2:00). Plaintiff alleges that, by the time that the tactical team returned, he was ready to "surrender peac[e]fully" and allowed officers

---

[2]OC stands for Oleoresin Capsicum, the active ingredient in pepper spray. Case No. 1:17-cv-440 involved a similar use of force to extract plaintiff from his cell based upon Plaintiff's failure to comply with an order to cuff up in December 2015. In that case, Plaintiff also claimed that the force used was excessive. The Court, adopting a Report and Recommendation by the undersigned, granted summary judgment based upon unequivocal video records and other evidence that left no genuine issue of material fact that the use of force was not excessive. The record presented evokes a sense of déjà vu, as the undersigned once again finds that the record refutes Plaintiff's allegations.

to cuff him behind his back and shackle his legs for transport. (Doc. 8 at 3). The video is consistent with this portion of Plaintiff's account, insofar as it depicts Plaintiff with his hands out, waiting to be cuffed. (Video Recording 21, 1:30). Defendant C/O Stephen Hale applied the restraints and held Plaintiff's right arm. (Video Recording 21, 1:50-2:30).

The parties dispute whether it was non-party C/O Spradlin or Defendant Hunley who held Plaintiff's left arm. Construing this issue in Plaintiff's favor for purposes of summary judgment, the undersigned assumes that Defendant Hunley held Plaintiff's left arm.[3]

The two Defendants walked with Plaintiff, each holding one of his arms using an escort technique, while other members of the team walked immediately ahead of and behind Plaintiff during the short walk from J1, Cell 3 to J1, Cell 13, a holding cell. (Video Recording 21, 3:00; Doc. 29-2 at 10, Bates Stamp 10).[4] The videographer followed immediately behind the group. The walk to the holding cell took approximately two and a half minutes. (Video Recording 21, 2:40-5:20).

Plaintiff's Eighth Amendment claim arises from allegations in his complaint that during this brief escort, both Defendants twisted Plaintiff's wrist and "purposely twisted his fingers causing permant [sic] injury to his right hand." (Doc. 8 at 3). Plaintiff alleges

---

[3] Multiple team members reported that C/O Spradlin held Plaintiff's left arm. (*See* Doc. 29 at 2; Doc 29-2 at 10-11, 16-17 (Hale's, Rigdon's, Eshem's, and Spradlin's reports); Doc. 29-2 at 13 (C/O Hunley reporting only specific action as team member was attempting to remove leg restraints in holding cell). However, at the beginning of the video just prior to the escort, Defendant C/O Hunley introduces himself as the officer who will secure Plaintiff's left arm. (Video Recording 21). In his summary reports, Lt. Broughton also identifies Defendant Hunley as the person assigned to Plaintiff's left arm. (Doc. 29-2 at 4-5).

[4] Defendants frequently cite to their own Bates Stamp numbers. Although the Court prefers to cite to its own electronic record, the undersigned has added some (duplicate) citations to the Bate Stamp numbers for additional clarity.

that he was screaming and "begging the Defendants to please stop, but both Defendants continued their assault on the Plaintiff." (*Id.* at 4).  The complaint further alleges that the Defendants continued to "bend his fingers one by one causing permanent injury" and continued to "bend each finger all the [way] back to capacity" following his placement in the segregation cell, up until the time that they departed.  (*Id.* at 4, ¶¶ 9, 10).

Even construing all reasonable inferences in Plaintiff's favor, the record does not fully support this portion of Plaintiff's account.  It is true that Plaintiff began screaming and/or yelling intermittently soon after the escort began.  (Video Recording 21).  Although it is difficult to make out intelligible words in the first minute of the escort, one cry (presumed to be Plaintiff's) sounds like the words "can't breathe."  Approximately one minute following Plaintiff's extraction from Cell 3, in reaction to Plaintiff's cries, Lt. Broughton instructs the group at the bottom of a short staircase: "Guys, hold up, have the nurse come and check him."  (Video 21, 3:43-4:00).  When Plaintiff begins to scream more loudly after the officers stop in compliance, Lt. Broughton raises his voice for the nurse to come "quick" and is seen running to summon him.  (*Id.* at 4:05).  He then returns to Plaintiff (who continues to scream) to reassure him that "the nurse is going to check you."  (*Id.*, at 4:17).

When the nurse arrives, Plaintiff quits screaming and speaks more clearly, complaining "they broke my finger man, they broke it," and "they broke my finger man, it's broke."  The nurse initially responds, "We'll check that later, other than that, you all right?" (*Id.* at 4:20-4:33).  After Plaintiff insists that his finger is the problem and resumes yelling, the nurse asks which one is bothering him and briefly examines Plaintiff's hands.  He then

instructs Plaintiff to "quit hollering" and asks "can you wiggle 'em?" to which Plaintiff responds by stating "I can't move it" and "I can't feel my hand." After examination, the nurse dismisses Plaintiff's concern, allowing the escort to proceed, expressly noting that Plaintiff's circulation is normal and that he appears to be "fine." (*Id*. at 4:34-4:50). Plaintiff continues to protest "don't let them do this to me man" as the procession continues the short remaining distance to Cell 13. As the group resumes walking, Plaintiff resumes screaming. Although Plaintiff undoubtedly made a complaint to the nurse around 7:30 p.m., he did not (as alleged in the complaint) repeatedly or specifically ask the Defendants to stop bending his fingers. To the contrary, during the first minute of the escort prior to his examination by the nurse, the basis for Plaintiff's intermittent cries was unclear, but the words "can't breathe" would reasonably imply he was bothered by the effects of the O.C. spray. During the brief remainder of the escort to Cell 13, Plaintiff utters no intelligible words.

Once inside Cell 13, Lt. Broughton instructs the team to place Plaintiff on the bed in order to remove his restraints. Plaintiff continues to scream and/or yell intermittently. Plaintiff's complaint alleges that he "did not struggle" and was "not combative at all." (Doc. 8 at 4, ¶11). However, the record unequivocally refutes that allegation. Throughout the time that Plaintiff lay prone on the bed, unidentified officer voices can be clearly heard instructing Plaintiff <u>repeatedly</u> to "quit resisting," and "do not resist!" (Video Recording 21). In addition to those unidentified voices, Lt. Broughton can be heard and seen sternly ordering Plaintiff at least twice to "let them remove restraints. Do not move." (Video Recording 21 at 6:45 and 7:11; *see also* Doc. 29-2 at 12, C/O Rigdon's report that Plaintiff

"began to resist by turning away from the wall and trying to move his arms from the team members holding them."; Doc. 29-2 at 17, C/O Spradlin report that "Bullocks continued to resist while laying on the bed in J1-13 trying to pull away from the office[rs] despite several direct orders from several officers to quit resisting")

The record next captures the fact that while Defendant C/O Hunley was attempting to remove the leg irons, the key became stuck and broke inside the restraint. (Video Recording 21; *see also* Doc. 29-2 at 13, Bates Stamp 13). Upon being informed of the stuck and broken key, Lt. Broughton radioed a request for bolt cutters. While the group waited, Plaintiff was again cautioned by an unidentified voice to "just lay there," and Lt. Broughton again ordered: "Bullock, lay there until I get the bolt cutters to cut your leg iron off. Do not resist." (Video Recording 21 at 10:26 to 10:33; *see also* Tr. 29-2 at 4, stating that Plaintiff was advised not to move while the officers waited for the bolt cutters). Once the bolt cutters were delivered, C/O Rayburn employed them and completed removal of the leg irons. (Video Recording 21; Doc. 29-2 at 4, 14-15, Bates Stamp 4, 14-15). Next, Defendant Hale removed Plaintiff's handcuffs. (Doc. 29-2 at 10, Bates Stamp 10). Plaintiff eventually quit yelling. After officers completed the removal of Plaintiff's restraints, they advised him to remain still until they exited the cell. (Doc. 29-2 at 4).

Immediately after the extraction team's departure, at approximately 7:45 pm, Nurse Mault returned to examine Plaintiff a second time. Plaintiff again reported finger pain and wrist pain. (Video Recording 22; *see also* Doc. 29-2 at 4, 20).[5] The nurse noted

---

[5] Nurse Mault's report and the video record both contradict Plaintiff's argument that he was not reassessed after the team left the cell. In opposition to summary judgment, Plaintiff argues that the medical evidence

that Plaintiff's pulses were normal, that his wrists and fingers exhibited no deformities, that full circulation was apparent, and that Plaintiff (who can be seen easily complying with a directive to move his fingers) had full range of motion for all fingers as well as his wrists. (*Id.*) The nurse declined Plaintiff's request for immediate x-rays, concluding based on his examination that no immediate medical care was required. At the same time he told Plaintiff that he could request follow-up by medical if needed. (*Id.*) Thus, the contemporaneous videotaped examination as well as a contemporaneous Medical Exam Report and other records refute Plaintiff's allegations of broken bones or "permanent injury."

The record reflects that Plaintiff frequently sought additional medical attention, submitting five Health Request Services forms during his confinement to disciplinary segregation following the incident. On August 29, 2016, Plaintiff submitted a Health Services Request in which he alleged that during the escort to the holding cell the previous day, the "C/Os unnecessarily bent my finger up and broke it as well as broke my wrist." Plaintiff sought medical attention "to set my finger and wrist in place." (Doc. 29-4 at 18, Bates Stamp 132). Plaintiff completed a second Health Services Request form on the same date, stating that both wrists "are swollen and I think I have a hand fracture and ankle fracture." (*Id.* at 19, Bates Stamp 133). Based upon Plaintiff's complaints of specific

---

is fabricated. (Doc. 31 at 3). This Court need not accept Plaintiff's wholly unsubstantiated argument in the face of contrary affidavits submitted by the Defendants that authenticate the records. The affidavits also aver that all records were created at or close to the time of the incident and have been maintained in the regular course of business. (Docs. 29-5 and 29-7). *Accord, Bullocks v. Keating*, Case No. 1:17-cv-440, Doc. 41, R&R at 13, n. 7 (rejecting Plaintiff's unsupported assertion that December 2015 medical records were fabricated by SOCF officials).

pain in his right hand, a nurse ordered an x-ray of that hand on August 30, 2016. (Doc. 29-4 at 4, Bates Stamp 118). That same day, Plaintiff submitted a third Health Services Request, this time complaining of "a bunch of little bumps in my mouth…." (Doc. 29-4 at 22, Bates Stamp 136).

On August 31, 2016, Plaintiff was examined by medical staff for his prior complaints of "wrists swollen, hand fracture, ankle fracture, sores in mouth," along with complaints of bilateral wrist pain and bruising (Doc. 29-4 at 2, Bates Stamp 116). Plaintiff expressed numerous concerns including "ongoing pain in both wrists and bruising, swelling in the right palm/fingers/hand." The examining nurse noted that Plaintiff voiced additional complaints of "left pinky and second finger and that area of palm tingles and no feeling in his knuckles, pain with squeezing hand closed." (*Id.*) Despite complaints of hand and ankle fractures, by the time of his examination, Plaintiff disavowed any complaints of ankle problems. (*Id.*) Likewise, Plaintiff reported at his August 31 exam that "the bumps in his mouth have resolved." (*Id.* at 3; Bates Stamp 117).

Physical examination findings of both hands and wrists were relatively benign, with no findings of any type of fracture. Instead, Nurse Teresa Hill noted the following:

> Tenderness with palpation of wrists and palm of right hand. Blue bruising to right palm with slight edema at knuckles. No bruising or edema of wrists noted…. Distal pulses present and equal bilaterally, skin is warm and pink, sensation to touch is equal bilaterally. Patient ambulating without difficulty. Nursing Assessment: … Alteration in Comfort R/T injury. Nursing Care Plan: Patient was given mediproxen yesterday. Encouraged to continue this and to soak hands in cool water or apply cool compresses. Patient has referral to alp in place…. Patient verbalizes understanding of – Medication actions, dosing and side effects, the importance of the need for rest of the involved joint or limb referral to alp in place and order for x-ray in place…. No restrictions on activity.

(Doc. 29-4 at 2; Bates 116).  In addition to the lack of any visible injury to either wrist, the nurse recorded no visible injuries to Plaintiff's left hand.  His complaints of numbness were contradicted by examination findings of bilaterally equal sensation to touch.[6]  The previously ordered x-ray of his right hand similarly revealed no acute injury or fracture, but did note mild osteoarthritis, a common degenerative disease.  (Doc. 29-4 at 1, Bates Stamp 115).

Plaintiff submitted two more Health Services Request forms during his time in segregation, but neither support his Eighth Amendment claim.  On September 1, 2016, Plaintiff sought medical attention for "some sort of infection in my mouth where the wisdom teeth comes in at on the left side."  (Doc. 29-4 at 23, Bates Stamp 137).  However, Plaintiff does not relate that complaint to any claim in this case.

On September 6, 2016, Plaintiff submitted a fifth form, seeking band-aids and triple-antibiotic cream, due to "deep cuts" on his wrists of unspecified origin.  (Doc. 29-4 at 20, Bates Stamp 134).  No such cuts previously had been either alleged by Plaintiff or noted during the August 31 examination of his hands.  Nevertheless, Plaintiff was again examined within three hours of his request.  That exam revealed no lacerations or any other injuries to the skin.  (Doc. 29-4 at 8, Bates Stamp 122).  Additionally, Plaintiff

---

[6] In opposition to summary judgment, Plaintiff suggests that his left hand was never examined, but multiple records including bilateral examination findings refute that contention.  Records also confirm that Plaintiff consistently complained most about an injury to his right hand/fingers or wrist.  (*See, e.g.*, Health Services Requests, asserting that Plaintiff had suffered "a hand fracture" (singular tense), and a single "broken wrist," as well as Plaintiff's amended complaint in this case, alleging "permanent injury to his **right** hand."  (Doc. 8 at 3, ¶ 7, emphasis added).  Plaintiff's focus on alleged injury to his right hand undermines any claim against Defendant Hunley, who is alleged to have had physical contact only with Plaintiff's left arm.

expressly denied pain "at present," and reported "the hand is getting better." (*Id.*) Plaintiff

denied any other concerns. (*Id.*) The examining nurse practitioner noted a full range of

motion in Plaintiff's right hand, with equal strength in both hands. (*Id.* at 9, Bates Stamp

123).

In addition to the complaint's unsubstantiated allegations of permanent injury to

his right hand, Plaintiff seems to allege that the incident caused significant mental health

injuries, resulting in a need for "medication every [sic] since the above incident…due to

depression." (Doc. 8 at 4, ¶12). As discussed below, however, there is no record support

for any link between Plaintiff's mental health and the August 2016 incident.

### III. Analysis

### A. Judgment Should be Granted on Eighth Amendment Claims

### 1. The Physical Injury Requirement of § 1997e(e)

A provision of the PLRA that is subtitled as a "Limitation on Recovery" states:

> No Federal civil action may be brought by a prisoner confined in a jail,
> prison, or other correctional facility, for mental or emotional injury suffered
> while in custody without a prior showing of physical injury or the commission
> of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e). In *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010), the Sixth

Circuit held that "even though the physical injury required by § 1997e(e) for a § 1983

claim need not be significant, it must be more than *de minimis* for an Eighth Amendment

claim to go forward."

Consistent with the Sixth Circuit's view,[7] this Court has dismissed prisoner civil rights claims that allege no more than *de minimis* physical injuries. *See e.g., Pullen v. Mannier*, 2015 WL 5562675 (S.D. Ohio Sept. 22, 2015) (Barrett, J., adopting R&R and holding injury that is "*de minimis*…cannot support a claim under the Eighth Amendment); *see also Hunter v. Clark*, No. 2:11-CV-06, 2013 WL 3049085 (E.D. Tenn. 2013). Here, although Plaintiff's complaint was permitted to proceed beyond screening because he alleged a "permanent injury" to his hand, the Defendants have come forward with unrefuted evidence that shows that Plaintiff suffered no more than a *de minimis* injury to his right hand or fingers. *De minimis* injuries for purposes of § 1997e(e) may include such things as swelling, pain and cramps. *Jarriett v. Wilson*, 162 Fed. App'x. 394, 400-401 (6th Cir. 2005). Because the medical evidence of record confirms only *de minimis* injuries, the Defendants are entitled to judgment as a matter of law.

In the absence of physical injury, Defendants also are entitled to judgment concerning Plaintiff's claim of mental injury under the same provision. Alternatively, summary judgment should be granted to Defendants because the record provides no support for such a claim. Plaintiff alleges that the incident caused serious mental health injuries, resulting in a need for "medication every [sic] since the above incident…due to depression." (Doc. 8 at 4, ¶12). However, the mental health record attached to Plaintiff's motion for summary judgment undermines his claim. There is nothing in that record to

---

[7] Some courts outside of the Sixth Circuit have held that the "physical injury" requirement set forth in §1997e(e) does not preclude a suit for nominal damages, as opposed to compensatory damages, under 42 U.S.C. § 1983. *See, e.g., Hutchins v. McDaniels*, 512 F.3d 193 (5th Cir. 2007); *Hughes v. Lott*, 350 F.3d 1157 (11th Cir. 2003).

suggest any possible causal link between the August 2016 incident and a medication increase four months later. To the contrary, the referenced psychiatric note reflects a routine follow-up visit in which Plaintiff reported "improvement in functioning with decreased irritability and improve[d] focus." (Doc. 25-1 at 3). Plaintiff further reported "a schedule where he works out at night and sleeps during the day to avoid the chaos of his current block." (*Id.*) The note reflects an increase to "Zoloft 100 mg daily at bedtime," with the rationale given that the inmate "prefers to be energized at night so he can work out [and] sleep during the day," implying that the timing of the medication was at least as important as the increase in dosing due to Plaintiff's preferred sleep schedule. (*Id.*) In short, the record does not even remotely support Plaintiff's claim of a significant increase in depressive symptoms caused by the August 28, 2016 incident.

### 2. Plaintiff's Eighth Amendment Claim

The Defendants also are entitled to summary judgment on Plaintiff's Eighth Amendment claim, independently of the provisions of § 1997e(e), based upon Plaintiff's failure to present evidence establishing either the subjective or the objective elements of his claim. An Eighth Amendment excessive force claim has both a subjective and an objective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). The subjective component focuses on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*; *see also Hudson v. McMillian*, 503 U.S. 1, 6, 112 S. Ct. 995 (1992). In making this inquiry, the Court must consider the need for the use of force; the relationship between that need and the type and amount of the force used; the threat reasonably perceived by the official;

14

and the extent of the injury inflicted. *Hudson*, 503 U.S. at 7; *Whitley v. Albers*, 475 U.S. 312, 320 (1986). The Eighth Amendment does not prohibit a *de minimis* use of force "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 501 U.S. at 10 (quoting *Whitley*, 475 U.S. at 327) (internal quotations omitted).

Regarding this subjective element, Plaintiff has failed to show that Defendants did not have a good faith basis for the force they employed during his escort to the holding cell, and/or upon arrival at that cell until they were able to obtain bolt cutters to complete the removal of Plaintiff's leg shackles. Plaintiff characterizes the incident as an "assault" by Defendant officers who "bent each finger all the [way] back to capacity" during his forcible escort. (Doc. 8 at 4, ¶10). Although the hallmark of an Eighth Amendment claim is "the unnecessary and wanton infliction of pain against prisoners," *see Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), the record here fails to show evidence of an "assault" or any malicious or sadistic intent to cause Plaintiff harm.

The undersigned acknowledges that the Defendants may not have escorted Plaintiff with "kid gloves" and that the record provides some modest support (mainly Plaintiff's contemporaneous intermittent yells and report to the nurse) that the escort technique caused discomfort. However, all evidence of record reflects that the escort technique used was routine under the circumstances; namely, the transport of an inmate to a nearby holding cell immediately after Plaintiff verbally threatened officers, threw water, refused to comply with multiple direct orders to cuff up, and belligerently insisted on the authorities "drop[ping] your [O.C.] bomb" and sending in their "team." (*See* Video Recording 21, Doc. 29-2 at 6). Importantly, the record blatantly contradicts Plaintiff's

15

account that once placed in the holding cell, he fully complied with orders to remain still so that his restraints could be removed. Thus, the circumstances presented reflect that force was applied "in a good faith effort to maintain or restore discipline," namely, a reasonable amount of force necessary to extract Plaintiff from his cell, transport him to the holding cell, and keep him secured until his restraints were removed.

The relatively routine nature of the extraction and transport, fully planned, authorized, and documented by video and other record evidence, and in combination with the minimal force used, all strongly support Defendants' position that they lacked the requisite subjective intent to cause Plaintiff harm. The time frame of the escort between the two cells was brief, roughly only 2 and a half minutes, with Plaintiff remaining in restraints for no more than an additional 10 minutes – a period briefly prolonged only because a key broke during the removal of Plaintiff's leg irons. The brevity of the overall period in which Plaintiff was restrained is consistent with the absence of malevolent intent.

In reviewing the videotape and record as a whole, the undersigned notes that the escort team reacted to Plaintiff's cries by halting their brief escort in order to have Plaintiff checked by medical personnel *en route*. (Video Recording 21). The examining nurse attended to Plaintiff's assertion that one of his fingers was "broke," but verbally acknowledged the lack of abnormal findings at the time of the video-recorded exam, and documented the same in his later written report. Plaintiff was provided with additional medical attention immediately after the extraction team departed, roughly fifteen minutes after the first exam. On both occasions, the examining nurse noted the absence of any evidence to corroborate Plaintiff's subjective assertion that the Defendants had broken

16

one of his fingers, but also dutifully noted those complaints and assured Plaintiff that he could request follow-up medical attention as needed. In fact, Plaintiff did request and receive such attention, including an x-ray that confirmed the absence of fracture and multiple additional exams that confirmed the absence of anything other than a *de minimis* injury. The immediate medical attention provided during and immediately after the escort adds to the body of evidence that the Defendants lacked any subjective intent to harm Plaintiff.

In addition to failing to produce evidence to support the subjective element of his claim, Plaintiff has failed to produce evidence to support the objective element of an Eighth Amendment claim. The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Cordell v. McKinney*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), and *Hudson*, 503 U.S. at 8). It is true that the extent of injury is not "dispositive of whether an Eighth Amendment violation has occurred," but it is also true that such evidence "may help determine the amount of force used by the prison official." *Cordell,* 559 F.3d at 580-81. Likewise, although it is unnecessary for an inmate to show any "significant" injury, the extent of the injury remains a factor to be considered in determining whether the assertion of force was objectively unreasonable. *See Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1178 (2010). "'When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... [w]hether or not significant injury is evident.'" *Hudson*, 503 U.S. at 9 (citation omitted). Yet, *Hudson* also counsels that "not… every malevolent touch by a prison guard gives rise to a federal

cause of action." *Hudson*, 503 U.S. at 9.  Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Pelfrey v. Chambers*, 43 F.3d 1034, 1039 (6th Cir. 1995) (internal quotation marks and citation omitted).

Contrary to Plaintiff's allegations of "permanent injury," the record is undisputed that Plaintiff suffered no more than a *de minimis* injury. *See e.g., Jones Bey v. Johnson,* 248 Fed. Appx. 675, 677 (6th Cir. 2007) (pain and swollen wrists resulting from tight handcuffs and striking a food slot are *de minimis* injuries under the Eighth Amendment); *see also, generally*, *Matthews v. Copeland*, 286 F.Supp.3d 912, 916 (M.D. Tenn. 2017) (granting summary judgment to defendants in part because the plaintiff's injuries from ankle shackles, including swelling and lacerations, were too *de minimis* to support Eighth Amendment claim)[8]; *Peterson v. Johnson*, 2011 WL 1627924, at *6 (W.D. Mich. 2011)("Minor injuries such as bruises and swelling are generally insufficient to support a claim under the Eighth Amendment's Cruel and Unusual Punishments Clause," citing *Silguero v. Acheson,* No. 7:08–cv–201, 2009 WL 56341, at * 2 (N.D. Tex. Jan. 9, 2009) (collecting cases)).

In context, the record reflects not only a *de minimis* injury, but clearly shows that the force itself was so *de minimis* as to be akin to a "push or shove" that might be second-guessed as "unnecessary" in the sanctum of a judge's chambers, but does not violate constitutional norms.  *See generally, e.g., White v. Fowler*, 881 F.2d 1078 (6th Cir. 1989)

---

[8] Appeal pending, docketed as Case No. 18-5070.

(Table) (granting summary judgment to officer who sprayed mace into inmate's face even though inmate was shackled, based on evidence that action was taken to restore discipline and security on a bus); *McDougald v. Dillow*, Case No. 1:16-cv-1099 (S.D. Ohio Aug. 2, 2018) (summary judgment granted to defendants for use of pepper spray); *McDougald v. Erdos*, Case No. 1:17-cv-95, 2018 WL 3772181 (S.D. Ohio Aug. 9, 2018) (same); *Thompson v. Esham*, Case No. 1:15-cv-553, 2018 WL 398439 (S.D. Ohio Jan. 12, 2018) (summary judgment granted despite use of multiple short bursts of pepper spray); *Payne v. Gifford*, Case No. 1:16-cv-514, 2017 WL 4329631 (S.D. Ohio Sept. 5, 2017) (holding that use of pepper spray demonstrated neither subjective nor objective components of Eighth Amendment claim); *Smith v. Bigham*, 2018 WL 2100518, at *6 (S.D. Ohio 2018); *Phillips v. Sammons*, Case No. 1:16-cv-1034 at *11 (S.D. Ohio Jan. 11, 2018) (granting summary judgment where officer deployed chemical spray). In summary, the record as a whole rebuts any "reasonable" inference that either of the Defendants violated Plaintiff's constitutional rights.

Last, it is worth noting that Plaintiff does not claim that the restraints themselves were too tight. In his response in opposition to summary judgment in this case, Plaintiff expressly denies that he has "stated any issues with handcuffing, or O/C…." (Doc. 31 at 5); *see also id*. at 7 "this case has nothing to do with handcuffing, walking to cells, or o/c spray at this time; this case is about the crushing and assaulting of [Plaintiff's] hands by the officers…."). *Compare Hansen v. Aper*, 746 Fed.Appx. 511, 516 (6th Cir., 2018) (explaining that physical injury is still required for a plaintiff to defeat summary judgment

in an excessively tight handcuffs case, quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

For all the reasons discussed, Plaintiff has not demonstrated either the objective or subjective components of his Eighth Amendment claim under clearly established law.

### 3. Qualified Immunity

In the unlikely event that a reviewing court would conclude that the objective or subjective components of an Eighth Amendment claim could be satisfied on the facts presented, Defendants still would be entitled to qualified immunity. The purpose of qualified immunity is to provide governmental officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (internal quotation omitted). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 129 S.Ct. 808 (2009).

When a defendant moves for summary judgment based on qualified immunity, the official must first show that he acted within discretionary authority. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once an official makes this showing, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established

20

that any reasonable official in that position would have understood it was unreasonable to engage in the conduct that violated the right. *Id.* Here, Plaintiff has made no claim that any Defendant was acting outside his authority. Thus, the burden has shifted to the Plaintiff to prove that, under the facts presented, Defendants violated Plaintiff's clearly established Eighth Amendment rights. The evidence in the record as a whole, including but not limited to the brevity of the time Plaintiff was restrained, the *de minimis* injury, and the medical attention paid to his complaints, all support the grant of qualified immunity. *See generally Hansen*, 746 Fed. Appx. at 517 (noting unpublished cases in which the brevity of the time spent in restraints supported the grant of qualified immunity); *O'Malley v. City of Flint*, 652 F.3d at 666 (granting qualified immunity to defendant on Fourth Amendment claim even though plaintiff allegedly was restrained in excessively tight handcuffs for two hours). *See also Smith v. Bigham*, 2018 WL 2100518, at *8 (S.D. Ohio 2018) (holding that correctional officer was entitled to qualified immunity based upon lack of any injury from secondary exposure to pepper spray).

## IV. Conclusion and Recommendations

Accordingly, **IT IS RECOMMENDED THAT:**

1. Defendants' motion for summary judgment on all claims presented (Doc. 28) should be GRANTED;

2. Plaintiff's motion for summary judgment, (Doc. 25) should be DENIED, and this case should be closed.

*s/ Stephanie K. Bowman*
*S*tephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

GERALD BULLOCKS,

      Plaintiff,

      v.

C/O HALE, et al.,

      Defendants.

Case No. 1:18-cv-288

Barrett, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).