# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

GERALD BULLOCKS,

      Plaintiff,

v.

C/O HALE, *et al.*,

      Defendants.

Case No. 1:18-cv-288
JUDGE DOUGLAS R. COLE
Magistrate Judge Bowman

## OPINION AND ORDER

This cause comes before the Court on the Magistrate Judge's May 23, 2019 Report and Recommendation ("R&R") (Doc. 35), recommending this Court grant the Defendants' Motion for Summary Judgment (Doc. 28) and deny Bullocks' Motion for Summary Judgment (Doc. 25). As required by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), this Court has made a *de novo* review of the record in this case. Based on that review, the Court **OVERRULES** Bullocks' Objections (Docs. 36, 41) and **ADOPTS** the Magistrate Judge's R&R (Doc. 35), albeit with minor modifications. Accordingly, for the reasons discussed more fully below, the Court **DISMISSES** Bullocks' Amended Complaint (Doc. 8) **WITH PREJUDICE** and **DIRECTS** the Clerk to terminate the case.

## FACTUAL BACKGROUND

On August 28, 2016, while being housed at the Southern Ohio Correctional Facility, Bullocks flooded his cell, threatened correctional officers, and refused to comply with direct orders to cuff up so he could be removed from his cell and

transported to a segregation unit. (R&R at #312). Because he refused to comply, pursuant to institutional policies, the correctional officers organized a use-of-force team, along with a videographer, to extract and transport Bullocks by force to a holding cell. (*Id.*; *see also* Video Recording 21, Doc. 30-1, 00:30–1:05). This team was made up of several individuals, including named Defendants Corrections Officer ("C/O") Stephen Hale and C/O Gary Hunley, along with Lieutenant Broughton, C/O Kimberly Hunley who operated the video camera, and C/O Lyle Rayburn who participated as a "shield man." (R&R at #312–13; Video Recording 21 at 00:30–1:05; Use of Force Investigative Report ("Investigative Report"), Doc. 29-2, #216). Two nurses from Medical and one nurse from Mental Health were also present. (Investigative Report at #217). Lieutenant Eshem participated as a crisis negotiator. (*Id.* at #216).

The crisis negotiator attempted to persuade Bullocks to cooperate peacefully, but Bullocks refused. Instead he stated, "get the team, I'm not coming out." (Video Recording 20, Doc. 30-1, 1:30–1:51). In response, Lt. Broughton deployed OC (Oleoresin Capsicum) pepper spray in Bullocks' cell and waited approximately 15 minutes for the spray to take effect before entering the cell block. (*See id.* at 2:00). Bullocks says, at this point, he was ready to surrender peacefully and allowed officers to cuff him. (R&R at #313–14). The Magistrate Judge found the video consistent with this portion of Bullocks' account. (*Id.* at #314). The officers cuffed Bullocks and, with Defendants Hale and Hunley holding his arms, the group then proceeded to escort

2

Bullocks from his current cell to a holding cell. (*Id.*). The walk took approximately two-and-a-half minutes total. (*See* Video Recording 21 at 2:40–5:20).

The instant lawsuit arises from this brief escort. Bullocks alleges that, while en route to the holding cell, Hale and Hunley twisted his wrist and hyperextended his fingers causing permanent injury to his right hand. (R&R at #314). Bullocks claims he screamed and begged Hale and Hunley to stop, but they continued to bend his fingers back causing irreparable damage. (*Id.* at #314–15). The video does show that Bullocks began yelling intermittently soon after the escort began. The Magistrate Judge found it difficult to make out intelligible words during the first minute of the escort, except one cry, presumably from Bullocks, that sounded like "can't breathe." (*Id.* at #315). About one minute after Bullocks left the cell, in reaction to Bullocks' cries, Broughton instructed the group: "Guys, hold up, have the nurse come and check him." (Video Recording 21 at 3:43–4:00).

When Nurse Mault arrived, Bullocks told him that Hale and Hunley had broken his finger. He complained, "they broke my finger man, they broke it" and "they broke my finger man, it's broke." The nurse initially responded, "we'll check that later, other than that, you all right?" (*Id.* at 4:20–4:33). Bullocks continued to insist his finger was the problem and resumed yelling. The nurse then briefly examined Bullocks' hand. He told Bullocks to "quit hollering" and asked, "can you wiggle 'em?" Bullocks said, "I can't move it" and "I can't feel my hand." After again examining Bullocks' hand, the nurse dismissed Bullocks' concerns, allowing the escort to proceed. He expressly noted that Bullocks' circulation was normal and that he

3

appeared to be "fine." (*Id.* at 4:34–4:50). Bullocks protested, "don't let them do this to me man," as the procession continued the short remaining distance to the cell. (R&R at #316).

Once inside the cell, Broughton instructed the team to place Bullocks on the bed and remove his restraints. Bullocks continued to yell periodically. (*Id.*). While Bullocks laid on the bed waiting for them to remove his restraints, unidentified officers can be heard clearly saying "do not resist!" and repeatedly instructing Bullocks to "quit resisting." (*Id.*). In addition to the unidentified voices, Broughton can be heard and seen on the video sternly ordering Bullocks at least twice to "let them remove [the] restraints. Do not move." (Video Recording 21 at 6:45, 7:11). When Hunley tried to remove the leg irons, the key broke inside the restraint, causing Bullocks to remain in the leg irons longer than usual so the officers could retrieve different equipment to remove the restraints. While the group waited, an unidentified voice cautioned Bullocks to "just lay there," while Broughton ordered, "Bullock, lay there until I get the bolt cutters to cut your leg iron off. Do not resist." (*Id.* at 10:26–10:33). The officers soon received the bolt cutters, removed the leg irons and handcuffs, and left the cell.

Immediately after the extraction team left, Nurse Mault returned to examine Bullocks' hand a second time. Bullocks again reported finger and wrist pain. (Investigative Report at #233). But Mault noted Bullocks' wrist and fingers exhibited no deformities and Bullocks had full range of motion. (*Id.*). Mault told Bullocks he could request follow-up medical visits if necessary. (*Id.*).

4

Subsequently, and frequently, Bullocks sought additional medical attention. He submitted five health service request forms during his confinement in disciplinary segregation. (R&R at #318). The day after the incident, on August 29, 2016, Bullocks submitted his first request, seeking medical attention to "set [his] finger and wrist in place" following the previous day's escort. (Bullocks' Medical Records ("Medical Records"), Doc. 29-4, #266). On that same day, Bullocks submitted a second request, claiming that both his wrists were swollen, and that he thought he had a hand and ankle fracture. (*Id.* at #267). On August 30, 2016, a nurse ordered an x-ray of Bullocks' right hand. (*Id.* at #250).

On August 31, 2016, medical staff physically examined Bullocks based on his complaints. (*Id.*). Bullocks expressed concern about "ongoing pain in both wrists and bruising, swelling in the right palm/fingers/hand." (*Id.*). The nurse noted "[t]enderness with palpation of wrists and palm of right hand. Blue bruising to right palm with slight edema at [the] knuckles. No bruising or edema of wrists noted. … No restrictions on activity." (*Id.*). Later, the x-ray report noted mild osteoarthritis, a common degenerative disease, but showed no acute injury or fracture. (*Id.* at #249).

On September 6, 2016, Bullocks submitted another medical request seeking band-aids and antibiotic cream because of "deep cuts" on his wrists. (*Id.* at #268). The medical staff examined him that same day. In addition to the alleged "deep cuts," Bullocks told the nurse he also "injured [his] right hand 10 days ago"—likely referring to the August 28th incident. (*Id.* at #256). The examination revealed no lacerations

5

or other injuries to the skin. (*See id.*). He told the nurse during this visit that his "hand is getting better." (*Id.*).

Bullocks also alleges he suffered depression following the August 28th incident and submitted to the Court one mental health treatment record in support of this claim. (*See* R&R at #322; Mental Health Records, Doc. 25-1, #102–03). That record, dated December 5, 2016, shows that Bullocks saw a psychiatrist for a follow-up visit. (Mental Health Records at #102). Bullocks reported to the psychiatrist an "improvement in functioning with decreased irritability and improve[d] focus." (*Id.*). While the report does not suggest Bullocks sought medication because of the incident, it does indicate that Bullocks requested an increased dose of Zoloft at night because he "prefers to be energized at night so he can work out [and] sleep during the day." (*Id.*).

On May 1, 2018, Bullocks filed a complaint under 42 U.S.C. § 1983 alleging Defendants' use of force during the transport constituted cruel and unusual punishment in violation of his Eighth Amendment rights. (*See* Compl., Doc. 3). Although his complaint is not the model of clarity, it appears he is seeking recovery for alleged physical injury, mental injury, and emotional distress, and also seeks injunctive relief, asserting that he "will continue to be irreparably injured by the conduct of the defendants" absent such relief. (*See* First Am. Compl., Doc. 8, #47).

Both parties filed cross motions for summary judgment. On May 23, 2019, the Magistrate Judge issued her Report and Recommendations, which recommended that this Court deny Bullocks' motion, grant Defendants' motion, and dismiss the case.

(Doc. 35). The Magistrate Judge offered three basic reasons for her decision. First, she held that § 1997e(e) of the Prison Litigation Reform Act required Bullocks to show a more-than-de-minimis physical injury as a prerequisite to a § 1983 claim asserting an Eighth Amendment violation, and found that given the undisputed medical evidence, Bullocks could not do so. Second, she found that Bullocks could not show that the conduct at issue violated the Eighth Amendment in any event, as it failed to meet either the objective or subjective component of the Eighth Amendment test. Finally, she found that the Defendants were entitled to qualified immunity. Bullocks filed timely objections (Doc. 36) and subsequently moved to supplement his objections. (Doc. 41). The Magistrate Judge's recommendation, Bullocks' original objections, and his motion to supplement those objections, are now before this Court.

## DISCUSSION

Bullocks lodges several objections to the Magistrate Judge's recommendations, largely rehashing arguments he made during summary judgment. Generally speaking, Bullocks accuses the Magistrate Judge of being biased and wrongfully weighing and construing the facts in the Defendants' favor. (*See* Plaintiff's Objections to Magistrate J. R. & R. ("Pl.'s Objs."), Doc. 36, #344). He objects to the Magistrate Judge characterizing his injuries as "*de minimis*," to her conclusion that Defendants lacked the subjective intent to harm him, and to her finding that Defendants would be entitled to qualified immunity as to Bullocks' Eighth Amendment claim—even if he could clear the hurdles necessary to show that a violation had occurred. The Court considers, and ultimately rejects, each objection for the reasons explained below.

7

A. **Bullocks Cannot Pursue A Claim For Mental Injuries Or Emotional Distress Under § 1983, Based On An Alleged Eighth Amendment Violation, As The Undisputed Facts Show, He Suffered At Worst A *De Minimis* Injury.**

As a general matter, § 1983 provides a vehicle to recover for injuries suffered when someone acting under color of state law deprives a person of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. §1983. That is, this section creates a private right of action for damages suffered as a result of a constitutional violation. But, when, as here, the allegedly injured person is a prison inmate, additional considerations come into play. That is because, in the Prison Litigation Reform Act ("PLRA"), Congress imposed certain limitations on prisoner actions under § 1983. Of particular import here, § 1997e(e) provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act.

42 U.S.C. § 1997e(e). The Magistrate Judge found that the undisputed facts show that Bullocks' claimed physical injury was at worst *de minimis*, and that § 1997e(e) thus precludes Bullocks from pursuing a § 1983 claim. The Court agrees with the former finding in its entirety, but agrees with the latter holding only in part.

The Sixth Circuit has held that "*de minimis* injuries" do not constitute a "physical injury" as that term is used in § 1997e(e). *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010) (noting that a "physical injury" "must be more than *de minimis* for an Eighth Amendment claim to go forward" under § 1983). The appeals court has also found that injuries such as swelling, pain, and cramps are merely *de minimis*

8

injuries for purposes of § 1997e(e). *See Jarriett v. Wilson*, 162 F. App'x 394, 400–01 (6th Cir. 2005).

Applying that framework here, the Magistrate Judge correctly found that the undisputed facts show that Bullocks' claimed injuries are, at worst, *de minimis* injuries. To be sure, he claimed during the escort that the guards broke his finger or fingers, which would have constituted more than a *de minimis* injury. But subsequent medical testing, including x-rays, failed to substantiate his claim of any broken bones. And the findings on physical examination, both during the escort and later, were largely non-remarkable. One examination, for example, conducted shortly after the escort, noted some "bruising to [the] right palm with slight edema at knuckles." (*See, e.g.*, Medical Records at #250 ("Blue bruising to right palm with slight edema at knuckles. No bruising or edema of wrists noted.")). Edema, of course, is another term for "swelling," which, as noted above, the Sixth Circuit has expressly characterized as *de minimis*, a characterization that is presumably all the more appropriate when the edema is "slight." In sum, minor bruising and slight swelling seem like almost paradigmatic examples of a *de minimis* injury.

Bullocks objects to that characterization, arguing that the Magistrate Judge wrongly stressed Bullocks' statements in which he claimed he had a bone fracture because these statements "were made in the heat of excru[c]iating physical pain[.]" (Pl.'s Objs. at #343–44). He also disagrees with the Magistrate Judge's reliance on the x-ray results disproving his injuries because the x-rays would only show skeletal injuries. (*Id.* at #344). These objections are meritless, however, because the

9

Magistrate Judge considered all the evidence and correctly concluded that the health records, as a whole, provided no support for Bullocks' claim. The problem for Bullocks is not that he was mistaken when he shouted that he had a bone fracture. Rather, the problem is that his health records do not show he experienced anything other than minor swelling and bruising. The Magistrate Judge correctly noted that the corrections officers may not have escorted Bullocks with "kid gloves," (R&R at #324), but pain and swelling is not enough to satisfy § 1997e(e)'s physical injury requirement.

There is a separate question, though, as to what impact that finding has on the claims that Bullocks seeks to advance here. Under § 1997e(e), a physical injury is a prerequisite only as to claims "for mental or emotional injury." Bullocks asserts such claims here, but he also appears to seek recovery for the alleged physical injury. By its plain language, though, § 1997e(e) does not make a non-de-minimis injury a prerequisite for recovery on the physical injury claim itself. Accordingly, while the statute bars Bullocks' claims for mental anguish or emotional injury, it does not prevent him from seeking compensatory damages for the physical injury.

Thus, to the extent that the Magistrate Judge found that § 1997e(e) bars Bullocks' claims for mental anguish or emotional injury, this Court affirms that finding. Conversely, though, to the extent that the Magistrate Judge found that the statute bars recovery on his physical injury claims, the Court reverses that finding. As further explained below, however, that does not change the ultimate disposition

of this case, as Bullocks cannot establish an Eighth Amendment violation as to the claimed physical injuries here, meaning that he still has no basis for recovery.

B. **Bullocks' Eighth Amendment Claim Predicated On His Alleged Physical Injury Fails As A Matter Of Law, As He Cannot Meet Either The Subjective Or Objective Component Of The Eighth Amendment Test.**

The Eighth Amendment prohibits the government from imposing "cruel and unusual punishment" upon prisoners. U.S. Const. amend. VIII. But not every shove by a prison guard gives rise to a constitutional violation. *See Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). Sometimes "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law." *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002). Prison officials nonetheless violate the Eighth Amendment when their "offending conduct reflects an unnecessary and wanton infliction of pain." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).

The test for establishing an Eighth Amendment violation has both a subjective and an objective component. Under the subjective component, a plaintiff must show the prison officials acted with a culpable state of mind. *See Cordell*, 759 F.3d at 581. That is, the Court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 580. The objective component, on the other hand, focuses on the force that the corrections officers used. The Supreme Court has made clear that this component does not turn on the severity of the injury caused, but rather looks to the appropriateness of the force employed. *See Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010)

11

(citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). To be sure, in a given case, the former may provide helpful information regarding the latter, but the key inquiry is whether the force was objectively unreasonable in the circumstances. More specifically, a plaintiff must establish that the defendants used a level of force that inflicted pain "sufficiently serious" to offend "contemporary standards of decency." *Cordell*, 759 F.3d at 585. Here, the Magistrate Judge correctly found that Bullocks could not establish either prong of this inquiry.

The Magistrate Judge started with an extensive and well-reasoned analysis of the subjective component. The Court will not repeat the entirety of that analysis, but suffice it to say that the undisputed evidence shows that Bullocks' arguments fall short. As the Magistrate Judge recounts in greater detail, when faced with a difficult situation, the corrections officers assembled a full transport team, implemented the prison's established transfer protocol, and recorded the entire process. Both the video and audio portions of the tape support the idea that this was a safely conducted transfer of an inmate who had refused to follow appropriate instructions from the officers. The Court agrees with the Magistrate Judge's conclusion that "the circumstances presented reflect that force was applied 'in a good faith effort to maintain and restore discipline,' namely a reasonable amount of force necessary to extract Plaintiff from his cell, transport him to the holding cell, and keep him secured until his restraints were removed." (R&R at #325). The Magistrate Judge further noted that, when Bullocks evidenced discomfort during the transfer, the video reflects that the officers stopped to provide medical personnel an opportunity to examine his

fingers and hand. This again suggests that they were not intending to maliciously harm him, but rather to secure his compliance with their efforts to transport him to the holding cell. Finally, the record also shows that Bullocks had extensive access to medical care after the transport to explore his alleged injuries. This undercuts his claim that the officers were acting with sadistic or malicious intent.

In the face of the substantial documentary evidence, Bullocks relies largely on speculation. He claims, for example, that the officers said "stop resisting" (which is heard on the audio portion of the tape) as an intentional ploy to create a legal defense for a potential future lawsuit, thus presumably indicating a carefully thought out plan to harm him while shielding themselves from liability. (Pl.'s Obj. at #342). And he claims a jury should decide whether the officers intentionally obstructed the video footage to block the camera showing the allegedly true reason why Bullocks was screaming. (*Id.*). Separately, Bullocks seeks to bolster his case for subjective intent by pointing out that the prison officials have supposedly been cited in countless excessive-force lawsuits. (*Id.* at #343).

But these bald allegations, without any actual evidence, do not show the officers subjectively intended to cause Bullocks harm. As the Magistrate Judge pointed out, multiple different people told Bullocks to stop resisting, not just the defendants named in this lawsuit. (R&R at #316–17). And, while the camera work admittedly would not qualify anyone for an Oscar for cinematography, if anything, the fact that the team took the step of creating an audio and video recording of the event undercuts the notion that they approached the transfer with a subjective intent

13

to do Bullocks harm. In sum, the relatively routine nature of the transport, the extensive documentation, including video and other record evidence, and his relatively minor injuries all indicate that Defendants lacked the subjective intent to harm him, and the Magistrate Judge was correct to reach that conclusion.

Bullocks fares no better in his efforts to satisfy the objective component. As noted above, here the inquiry is whether the force applied was reasonable in light of the circumstances. *See Wilkins*, 559 U.S. at 39; *Hudson*, 503 U.S. at 7. As the Magistrate Judge pointed out, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson* 503 U.S. at 9. But not every "malevolent touch by a prison guard gives rise to a federal cause of action." *Id*. The Eighth Amendment's prohibition against "cruel and unusual" punishment necessarily excludes *de minimis* uses of physical force, "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 9–10 (quotation omitted). Here, as described above, Bullocks' injuries were relatively minor, including swelling and bruising. This type of injury, and more importantly the force required to create it, certainly does not as a general matter offend traditional standards of decency. Rather, the video evidence shows that the officers were using a reasonable amount of force to safely transport an inmate from the cell he had intentionally flooded to another cell.

Nor can Bullocks escape that result by seeking to satisfy the objective component through reference to his claims of mental health injury. To start, as noted above, absent a physical injury, such claims would not give rise to a right to relief

under § 1983 in the prison context. But, even putting that aside, his claimed mental health injury does not meet the objective significance requirement. Indeed, the medical records do not tie his claim of depression to the escort events at all. Rather, the mental health record he submitted specifically states the reason he sought anti-depressants, which was not a result of mental trauma from the escort. Instead, he wanted an increased dose of Zoloft at night because he "prefers to be energized at night so he can work out [and] sleep during the day." (Mental Health Records at #102). Bullocks asserts that the mental health staff's failure to observe in their records that his treatment was in response to the events that occurred during the escort could be because mental health staff misstated or altered the medical records to hide Bullocks' allegations against fellow institutional staff members. (Pl.'s Objs. at #344). But that is again merely unsupported speculation. That is not enough to create a triable issue of fact for a jury.

### C. Bullocks' Objection To The Magistrate Judge's Finding On Qualified Immunity Fails.

Bullocks also objects to the Magistrate Judge's finding that Defendants are entitled to qualified immunity. As the Court has found that there is no underlying constitutional violation, there is no need for the Court to address qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (noting that Court can consider the underlying merits before or after the question of qualified immunity). In any event, the sole objection that Bullocks raises here is that the Defendants should not receive such immunity because "the alleged conduct was out of the scope of doing [their] duty." (Mot. for Leave to Amend Pl.'s Obj. to R. & R., Doc. 41, #357). The conduct

here—transporting Bullocks from one cell to another in response to him flooding the first cell—is clearly within the scope of Defendants' duty as correctional officers. Thus, Bullocks' objection has no merit, anyway.

## CONCLUSION

Based on the foregoing, the Court **ADOPTS** the Magistrate Judge's R&R (Doc. 35), subject to the minor modification set forth above. Accordingly, the Court **GRANTS** Bullocks' Motion for Leave to Amend Plaintiff's Objection to Report and Recommendation (Doc. 41), but ultimately **DISMISSES** Bullocks' Amended Complaint (Doc. 8) **WITH PREJUDICE** and **DIRECTS** the Clerk to terminate the case.

**SO ORDERED.**

April 6, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**